**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AGNES HERCEG, on behalf of herself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>CHOBANI, LLC, 147 State Highway 320, Norwich, NY 13815,<br><br>*Defendant*. | Case No.: 22-CV-5137 (KMK)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Agnes Herceg ("Plaintiff" or "Herceg"), individually and on behalf of all other similarly situated individuals, by and through her counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendant Chobani, LLC ("Chobani" or "Defendant"), regarding the deceptive marketing of Chobani's products. Defendant markets its products as beneficial to farm workers and animals involved in its supply chain based on being Fair Trade USA Certified, explicitly representing that its products adhere to the "highest standards" for workers, "promote[] sustainable livelihoods," and "support[] . . . safe animal care." In stark contrast to its marketing representations, Chobani's products do not represent the highest standards for workers, nor do they promote sustainable livelihoods or safe animal care. Far from it. Instead, its representations are false, without basis, and are meant to deceive consumers. Indeed, farm workers in Chobani's supply chain, a particularly vulnerable labor force, are subject to numerous abusive labor practices, and cows raised for dairy are subject to inhumane practices.

Plaintiff Herceg alleges the following based upon information, belief, and the investigation of her counsel:

**INTRODUCTION**

1.    Chobani, an American food company headquartered in New York, is one of the largest sellers of yogurt in the United States.[1]

2.    Fair Trade USA is an independent nonprofit organization that sets standards that it claims protect farm workers and partners with businesses to certify certain products.

3.    Chobani sells "Fair Trade Certified™" dairy products (the "Products")[2] throughout New York and across the United States.

4.    Historically, farm workers in the United States have suffered from low wages, long hours, dangerous working conditions and an overall lack of legal protections afforded to workers in other industries. This disparity has an overwhelmingly disproportionate impact on the immigrants and racial minorities who make up the majority of the agricultural workforce. This has led to worker-led movements, including in the dairy industry, for better working conditions.

5.    The mistreatment of farm animals has also been widely documented, with conditions like overcrowding, illness, and physical abuse as the industry norm for cows raised on large-scale dairy farms.

6.    Increasingly, consumers have become aware of these injustices, creating a growing market share of consumers who wish to purchase products from companies that employ better protections for workers and animals for ethical reasons.

---

[1] Trish Novicio, *15 Biggest Yogurt Companies in the World*, Yahoo Finance (Feb. 11, 2021), https://finance.yahoo.com/news/15-biggest-yogurt-companies-world-082724518.html.

[2] These include, but are not limited to, Chobani's 32-ounce, multi-serve Greek yogurt tubs, including Whole Milk Plain, Low Fat Plain, Non-Fat Plain, Strawberry Blended, and Vanilla Blended. Discovery may reveal that additional Chobani brands and products should be included within the scope of the allegations in this Complaint, and Plaintiff reserves the right to add such products.

7.     During the Class Period (as defined below), on labels found both on the outside container and beneath the lid of the Products, Chobani prominently advertises that the Fair Trade USA Certified Products promote sustainable worker livelihoods and safe animal care.

8.     Contrary to these advertisements, Chobani fails to protect its workers or its animals.

9.     In reality, farm workers in Chobani's supply chain are subject to the same exploitative labor practices and abuses that plague farm workers throughout the dairy industry. Neither Chobani's internal standards, nor the Fair Trade USA certification, are sufficient to protect these workers, as Chobani's advertising claims.

10.     Many of Fair Trade USA certification's key standards, including those concerning minimum wage and overtime, do no more than enshrine the weak protections for farm workers already existing under U.S. law, which fall short of protections that reasonable consumers would expect to be afforded to farm workers within Chobani's supply chain based upon the representations and certification at issue.

11.     Additionally, both Chobani's actual practices as well as the Fair Trade USA certification scheme fail to ensure safe conditions for animals, as they purport to do.

12.     Thus, Chobani's advertising—which implies that the Products' certification ensures sweeping benefits for dairy workers and animals above and beyond minimum compliance with federal and state law—is false and misleading.

13.     Upon information and belief, many, if not all, of Chobani's suppliers fail to implement any protections for farm workers or animals that exceed the minimum standards required by law.  In fact, farms within Chobani's supply chain have often been cited for violations of labor laws that provide irrefutable evidence that neither Chobani nor the Products "promote sustainable livelihoods" for its farm workers.

14. By deceiving consumers about the nature of the Products, Defendant is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take market share away from competing Products, thereby increasing its own sales and profits.

15. Because Defendant's marketing of the Products tends to mislead and is materially deceptive about the true nature and quality of the Products, Plaintiff Herceg brings this deceptive advertising case on behalf of herself and all others similarly situated and seeks equitable and monetary relief.

## FACT ALLEGATIONS

**I. Chobani Represents that the Products "Promote Sustainable Livelihoods" for Farm workers within Chobani's Supply Chain and "Support Safe Animal Care" at Its Supplier Farms.**

16. Plaintiff Herceg brings this suit against Chobani based on misrepresentations that the Fair Trade USA Certified Products represent the "highest standards," "promot[e] sustainable livelihoods," and "support[] safe . . . animal care."

17. Chobani knows that American consumers increasingly seek out and will pay more for dairy products that are sustainable, benefit the industry's workers, and are produced in accordance with higher animal care standards.

18. To capitalize on this market of consumers who wish to purchase more ethically-produced dairy, Chobani cultivates an image of the Products as being beneficial to workers and animals.

19. Chobani's representations, which appear on the Products' labeling[3] during the Class Period, include the following statements:

---

[3]    *Chobani    Plain    Greek    Yogurt,    32    oz*,    Whole    Foods    Market, https://www.wholefoodsmarket.com/product/chobani-plain-greek-yogurt-b008u5ostq [https://web.archive.org/web/20230604103036/https://www.wholefoodsmarket.com/product/chobani-plain-greek-yogurt-b008u5ostq].

- "When you choose our Fair Trade Certified™ Dairy you say:

    o Yes to products made under the highest standards.

    o Yes to promoting sustainable livelihoods.

    o Yes to safe working conditions for farmers and workers.

    o Yes to taking care of the people who take care of animals.

    o Yes to strong, transparent supply chains."





BILLIONS OF PROBIOT...

Chobani is the first Fair Trade USA® dairy company in the country.
When you choose our Fair Trade Certified™ Dairy, you say:

Yes to products made under the highest standards.
Yes to promoting sustainable livelihoods.
Yes to safe working conditions for farmers and workers.
Yes to taking care of the people who take care of animals.
Yes to strong, transparent supply chains.

**Authentically crafted**
No artificial flavors
No artificial sweeteners
No preservatives
No gluten
No rBST**

For recipes using our
Non-Fat Plain Greek Yogurt,
**chobani.com/recipes**

**Milk from rBST-treated cows is not significantly different.

- "Eating this yogurt empowers dairy farmers, ***supports safe*** working conditions and ***animal care***, and provides extra income to the people who helped make this product." (Emphasis added.)



20.    Chobani's worker and animal welfare representations are designed to lead, and do lead, consumers to believe that Chobani's Fair Trade Certified Products are made in a way that benefits farm workers and animals.

21.    Chobani tells consumers that by buying the company's "Fair Trade Certified™ Dairy [they] say: Yes to products made under the ***highest standards***."[4]

22.    Consumers widely understand the term "fair trade" to relate to "establishing prices for products that allow for living wages for workers."[5] Moreover, Chobani's "highest standards" statement appears alongside numerous other statements referring to workers, including the claim that the Products "promot[e] sustainable livelihoods."[6]

---

[4] *Supra* ¶ 17 (emphasis added).
[5] David Burgin & Robert Wilken, *Increasing Consumers' Purchase Intentions Toward Fair-Trade Products Through Partitioned Pricing*, Journal of Business Ethics (2021), https://doi.org/10.1007/s10551-021-04938-6.
[6] *See supra* ¶ 17.

23.     Thus, reasonable consumers viewing Chobani's claim that Fair Trade USA certification signifies that its Products are made under the "highest standards" will understand Chobani to be claiming that it implements standards relating to worker compensation and safety that go beyond the bare minimum required under U.S. law, to which Chobani and its competitors are already obligated to comply.

24.     Based upon these representations, consumers are willing to pay, and Chobani benefits from, a premium price for the Fair Trade USA Certified Products, especially because the Products are dairy products, a category of products that are widely known to have problematic supply chains. Regardless of whether Chobani passes any costs associated with the certification directly to consumers, Chobani benefits financially from being able to charge more for the Products than would otherwise be possible, and from consumers' desire to buy the Products, or buy more of the Products, because of the representations.

25.     Consumers are willing to pay this premium because Chobani's representations and Fair Trade USA certification reasonably and purposefully lead consumers to believe that Chobani is passing on at least some of its profits to farm workers within its supply chain and/or that Chobani incurs additional operating costs to implement standards that go above and beyond what is already required pursuant to U.S. law.

26.     Unfortunately, upon information and belief, farm workers in Chobani's supply chain are not paid more than the minimum wage required for agricultural workers pursuant to applicable federal and state law, nor are any additional protective measures implemented to ensure worker safety at Chobani supplier farms.  Additionally, animals in Chobani's supply chain are subjected to the same inhumane conditions and abuses that plague the dairy industry.

## II. Chobani's Fair Trade USA Certified Products Do Not Promote Sustainable Livelihoods for Farm workers within Chobani's Supply Chain.

27. Despite these explicit marketing representations enumerated in *supra* § I, Chobani's Fair Trade USA Certified Products fail to improve key factors for sustainable livelihoods beyond the bare minimum required under U.S. law, and Chobani's farm workers are, in fact, subjected to the same abuses that plague the dairy industry as a whole.

28. By way of background, dairy workers are among the most exploited and vulnerable workforce in the United States.

29. Dairy workers suffer some of the highest rates of fatalities and injuries in U.S. agriculture[7] and are routinely paid less than minimum wage, issues that are compounded by the vulnerabilities of the large immigrant population working at U.S. dairies, many of whom work an average of 12 hours a day.[8]

30. These issues have grown even more acute in the wake of Chobani's growing popularity. "Fatalities on New York dairy farms rose after Chobani began producing yogurt in 2007, with deaths peaking in 2014."[9]

31. And, problematically, farm workers have few legal protections under existing frameworks because they are exempt from most key labor laws, such as the provisions of the Fair

---

[7] Teddy Ostrow & Amelia Evans, *Fair trade milk could be bad for US dairy workers' health*, Open Democracy (June 10, 2021), https://www.opendemocracy.net/en/beyond-trafficking-and-slavery/fair-trade-milk-could-be-bad-for-us-dairy-workers-health/.

[8] *See* Carly Fox, et al., *Milked: Immigrant Dairy Farm workers in New York State*, A Report by the Workers' Center of Central New York, and the Worker Justice Center of New York (2017), https://milkedny.files.wordpress.com/2017/05/milked_053017.pdf.

[9] *See* Olivia Heffernan and Margaret Gray, *For Chobani's Fair Trade Certification to Live Up to Its Promises, We'll Need Labor Unions*, Jacobin Magazine (Jan. 31, 2022), https://jacobinmag.com/2022/01/dairy-farm workers-unions-safety-new-york-rwdsu-ufcw; Joanna Zuckerman Bernstein, *Dairy dangers: As production rises, so do concerns about farm workers' safety*, Albany Times Union (Jun. 7, 2014), https://www.timesunion.com/local/article/Dairy-dangers-As-production-rises-so-do-5536860.php.

Labor Standards Act that provide for overtime pay and even basic government regulations relating to health and safety standards.[10]

32.     Despite its marketing claims, Chobani has a long history of exploiting its New York and Idaho farm workers.

33.     Upon information and belief, Chobani sources the dairy used to make the Products, in part, from various Dairy Farmers of America ("DFA") farms located throughout the state of New York.[11]

34.     A recent report analyzing interviews with 88 undocumented Mexican and Central American farm workers who live and work on multiple dairy farms throughout New York reveals a pattern and practice of labor abuse.[12] Upon information and belief, Chobani sources its dairy from various farms mentioned in this report.

35.     That report found that nearly half of the farm workers interviewed suffered discrimination in the workplace, with one-fifth reporting that their boss, manager, or coworkers made explicit references to their ethnicity and/or citizenship status in a "demeaning or intimidating manner." Similarly, 28% reported aggressive and disrespectful behavior from their boss.[13]

36.     Workers reported feeling rushed on the job, and normally work 12-hour shifts, sometimes with only a minimal five-minute break.[14]

---

[10] *See* Anna Canning, *Fair Trade Dairy at One Year: Labor Abuses, Low Standards, and Misleading Labels*, Fair World Project (Mar. 29, 2022), https://fairworldproject.org/fair-trade-dairy-chobani-labor-abuses/#link1; *Fact Sheet #12: Agricultural Employers Under the Fair Labor Standards Act (FLSA)*, U.S. Dep't of Labor (Jan. 2020), https://www.dol.gov/agencies/whd/fact-sheets/12-flsa-agriculture (noting that many agricultural workers including "[t]hose principally engaged on the range in the production of livestock" are exempt from FLSA minimum wage guarantees.).
[11] Canning, *supra* note 10.
[12] Carly Fox, et al., *supra* note 8.
[13] *Id.* at 10.
[14] *Id.* at 11.

37.     Additionally, 28% of farm workers said they experienced at least one instance of wage theft including: denial of a final paycheck, being paid only for scheduled hours and not extra hours actually worked, unpaid "training," and non-reimbursement for personal protective equipment.[15]

38.     Disturbingly, two-thirds of the workers surveyed experienced one or more work-related injuries; 68% of those injured workers stated that their injuries were serious enough to require medical attention.[16]

39.     One-third of workers received no job training of any kind, and when training is offered, it is frequently insufficient: lasting less than ten minutes total; offered only in English when many workers do not speak English; or conducted by co-workers who themselves were not sufficiently trained.[17]

40.     97% of workers report living in on-farm housing provided by their employers. This housing is frequently substandard: 58% of workers reported insect infestations in their employer-provided housing; 48% have no locks on their doors; 32% have holes in their walls and/or floors; and 32% reported insufficient ventilation.[18]

41.     Moreover, government agency records reveal workplace hazards at Chobani's New York facility located at 669 Country Road 25, New Berlin, New York.

42.     In 2019, Chobani was cited for (1) failing to shut down its main power supply to fill lines before workers began cleaning those lines, causing a risk of electrocution to workers; (2) failing to utilize "group lock out procedures" when cleaning filling machines thereby failing to "afford the employees a level of protection" required; and (3) failing to provide appropriate

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 12.

machine guarding necessary to protect machine operators and other employees in the machine area from hazards at the "upstacker."[19]

43. In 2020, Chobani was similarly cited for failing to provide appropriate machine guarding necessary to protect machine operators and other employees in the machine area from hazards, exposing workers to potential injuries.[20]

44. In 2021, Chobani was similarly cited for failing to provide appropriate machine guarding at a door barrier guard.[21]

45. OSHA records also reveal workplace hazards at Chobani's Idaho facility at 3450 Kimberly Road, Twin Falls, Idaho.

46. In 2014, Chobani was cited for failing to train workers who operate its powered industrial trucks.[22]

47. In 2018, Chobani was cited for (1) failing to provide adequate training for operating the ammonia refrigeration system; (2) failing to have a procedure in place for handling ammonia spills; (3) incorrect installation of ammonia valves and piping; and (4) failing to develop and implement procedures for employees to safely regulate liquid ammonia pressure.[23]

48. In 2018, Chobani was cited for forcing "employees [to] exit[] from the utilities manager's office into the compressor area where an ammonia leak was occurring."[24]

---

[19] *Inspection: 1384972.015 - Chobani, LLC*, OSHA, https://www.osha.gov/ords/imis/establishment.inspection_detail?id=1384972.015 (last visited Oct. 23, 2023).
[20] *Inspection: 1496649.015 - Chobani, LLC*, OSHA, https://www.osha.gov/ords/imis/establishment.inspection_detail?id=1496649.015 (last visited Oct. 23 https://enforcedata.dol.gov/views/results.php, 2023).
[21] *Data Enforcement*, U.S. Dep't Labor, https://enforcedata.dol.gov/views/results.php (last visited Oct. 23, 2023).
[22] *Id.*
[23] *Id.*
[24] *Id.*

49.     Upon information and belief, Chobani sources some of the dairy used to make the Products from Marks Farms, located at 6314 Cannan Road, Lowville, New York, one of the largest dairies in New York state.

50.     Crispin Hernandez, a farmworker turned labor advocate, worked on Marks Farms until late 2015. Mr. Hernandez states that, during his employment, he and his coworkers suffered from routine abuse by their employers, stating "[t]hey treated us like slaves."[25]

51.     As is typical of dairy workers, Hernandez and his coworkers often worked consecutive 12-hour shifts. Due to the size of the farm and the large number of cows the workers were responsible for, workers at Marks Farms frequently cannot take a break to eat lunch, and report that if they attempt to take a break to even simply "drink water or go to the bathroom, [they] can fall behind."[26]

52.     Hernandez notes that there "are many accidents," a problem that is compounded because "many [workers] aren't trained."[27]

53.     Hernandez reports being injured shortly after starting work at Marks Farms when a cow stepped on his hand. Although Hernandez was bleeding, and the farm's owner and her daughter saw the injury, "they didn't care"—neither told Hernandez to seek medical treatment or even to take time off.[28]

54.     Workers at Marks Farms suffer "routine verbal abuse and occasional physical violence in the workplace."[29] In March 2015, a worker was physically assaulted by a Marks Farms manager.[30]

---

[25] Carly Fox et al., *supra* note 8 at 16.
[26] *Id.* at 15.
[27] *Id.* at 16.
[28] *Id.*
[29] *Id.*
[30] *Id.*

55.     Ultimately, these abuses led Mr. Hernandez and a coworker to try to organize a committee to address health and safety issues at Marks Farms. Yet, when the workers gathered to meet to discuss these concerns, the son of the farm owner called the police to intimidate the attendees, many of whom were undocumented. Mr. Hernandez and his coworkers persevered and carried on with their meeting despite the harassment. But only one week later, Mr. Hernandez and his co-organizer were fired, a move that the Workers' Center of Central New York calls "a brazen act of employer retaliation."[31]

56.     Additionally, government records reveal workplace hazards at Marks Farms.

57.     In 2014, Marks Farms was cited for: (1) failing to train employees on the hazards of chemicals they were exposed to and failing to train employees on ways to protect themselves from such hazards; (2) failing to provide required safety data sheets for those hazardous chemicals and products that employees were using; and (3) failing to develop and implement a "hazard communication program" for the use of hazardous chemicals.[32]

58.     In 2018, Marks Farms was cited for: (1) failing to shut down power to prevent the risk of electrocution before employees began performing maintenance on the farm's manure separator; (2) failing to provide annual training to employees working on "covered equipment," including failure to train employees on safe operating practices; and (3) exposing employees to a risk of being caught in the manure separator machine.[33]

59.     Because of hazardous working conditions, exhaustion, and insufficient training, among other abuses, worker deaths are all too common at those New York dairies that supply

---

[31] *Id.*
[32] *Data Enforcement*, *supra* note 21.
[33] *Id.*

Chobani. Since 2007, when Chobani began selling the Products out of its facility in South Edmeston, NY, more than three dozen people have died on New York dairy farms.[34]

60.     In 2011, Richard Fesko died in a manure pit accident while working at a dairy farm in Onondaga County that supplies milk to Chobani for use in the Products.[35]

61.     In 2017, a worker at Marks Farms, which, upon information and belief, sells milk to Chobani for use in the Products, was "caught in a machine and killed."[36]

62.     It is misleading for Chobani to tout its Fair Trade USA Certified Products as representing the "highest standards" or otherwise going beyond standards followed by the rest of the industry when that certification does nothing more than follow basic legal requirements (or lack thereof), particularly on areas where other programs for dairy workers provide higher standards.

63.     Chobani's Fair Trade USA certification further does not require Chobani to pay its workers above the federal agricultural worker minimum wage required by federal law (often significantly lower than standard federal minimum wage). Upon information and belief, neither Chobani nor the farms from which Chobani sources its ingredients for the Products, pay their agricultural workers higher than minimum wage as required by law.

64.     As such, Chobani's Fair Trade USA Certified Products cannot be said to adhere to the "highest standards" or to "promote sustainable livelihoods" for farm workers within the Products' supply chain.

---

[34] Joanna Zuckerman Bernstein, *supra* note 9.
[35] *Id.*
[36] *Data Enforcement*, *supra* note 21.

### III. Contrary to Chobani's Representations, Its Fair Trade USA Certified Products Fail to Benefit Animals.

#### A. Cows Raised for Chobani's Milk Are Subjected to Inhumane Conditions.

65. Cows raised in industrial dairy operations are routinely subject to cruel and inhumane practices that do not comport with consumer understanding of "safe . . . animal care."

66. In order to continue to produce milk, dairy cows are repeatedly impregnated by artificial insemination (approximately once per year for the entirety of the cow's life until slaughter).[37] When their calves are born, mothers and calves are separated almost immediately after birth, causing severe trauma and emotional distress.[38]

67. Female calves, once forcibly removed from their mothers, are then confined to barren individual calf stalls or "hutches" for the first three months of their lives.[39] These hutches are just large enough to allow the calves to turn around and deprive the calves of necessary socialization with other cows, increasing stress. At eight weeks, female calves are often "dehorned," *i.e.*, will have their horn buds removed, often without any pain management.[40]

68. Cows raised for dairy are frequently confined indoors for their entire lives, without the ability to express natural behaviors, like grazing, or even see sunlight.[41]

69. Dairy cows are commonly raised on concrete flooring, often leading to lameness, painful hoof infections, or deformities.[42]

---

[37] *Dairy's Dark Secrets*, Animal Equality, https://animalequality.org/issues/dairy/ (last visited Oct. 17, 2023).
[38] Andrew Jacobs, *Is Dairy Farming Cruel to Cows?*, N.Y. Times (Dec. 29, 2020), https://www.nytimes.com/2020/12/29/science/dairy-farming-cows-milk.html.
[39] *Id.*
[40] *Id.*
[41] *Welfare Issues for Dairy Cows*, Compassion in World Farming, https://www.ciwf.com/farmed-animals/cows/dairy-cows/welfare-issues/ (last visited Oct. 23, 2023).
[42] M.A.G. von Keyserlingk et al., *The Welfare of Dairy Cattle–Key Concepts and the Role of Science*, 92 J. Dairy Sci. 4101 (2009), https://www.sciencedirect.com/science/article/pii/S0022030209707350.

70.     In many older dairy systems, cows are confined indoors in "tie-stalls" where the cows are tied to a single stall for all or most of the day.[43]

71.     Cows raised for dairy frequently suffer from painful lameness, and have difficulty walking, standing, and/or lying down due to their excessive udder weight from having to constantly carry several extra pounds of milk in their udders.[44]

72.     Because dairy cows are tightly confined indoors in unsanitary conditions, they frequently suffer from mastitis, a painful udder infection.[45]

73.     Upon information and belief, Chobani and its suppliers raise cows in the above-described manner.

**B. Chobani's Fair Trade USA Certification Does Not Include Any Standards on Animal Care Beyond What is Already Required by Law.**

74.     Contrary to Defendant's claims that the Fair Trade USA dairy certification "supports safe. . . animal care,"[46] the Agricultural Production Standard ("APS") that undergirds the certification only requires compliance with existing U.S. law to which Chobani and its competitors are already required to comply.

75.     Despite broadcasting to consumers that the Products support "animal care," the APS is without ***any*** animal care or welfare provisions that provide protection to animals beyond what is required by law. It is, therefore, misleading for Chobani to present its Fair Trade USA certification to consumers as supporting animal care that exceeds state or federal standards.

76.     Upon information and belief, neither Chobani nor its supplier farms have any animal care standards in place that go beyond what is already required by state and federal law.

---

[43] *Welfare Issues for Dairy Cows*, *supra* note 41.
[44] *Id.*
[45] *Id.*
[46] *Supra* ¶ 17.

77.     Upon information and belief, neither Chobani nor its supplier farms actually implement any animal care standards that go beyond what is already required by state and federal law.

**C. Chobani's Supplier Cooperative Has a Documented History of Inhumane Practices and Animal Mistreatment.**

78.     Upon information and belief, Chobani sources all and/or most of the dairy used to make the Products, from dairies within the DFA cooperative.

79.     Undercover investigations reveal a pattern of egregious animal mistreatment at DFA-affiliated dairies.

80.     In 2015, Mercy for Animals ("MFA") conducted an undercover investigation of Cactus Acres Holsteins in Fort Morgan, CO, a supplier of dairy for DFA.[47]

81.     That undercover footage revealed intentional abuse—workers stabbing a cow with a screwdriver, hitting another cow with a stick, and slapping, punching, and kicking cows.

82.     In 2017, Animal Outlook ("AO") conducted an undercover investigation of Mason Dixon Farms in Gettysburg, PA, a supplier of dairy for DFA.[48]

83.     Video footage of that AO undercover investigation shows workers kicking cows in the face, punching cows in their udders, excessively shocking cows with electric prods, jabbing cows with pens and elbows, and twisting cows' tails.

84.     That footage also showed cows living in "hazardous conditions," namely, routinely getting stuck inside water troughs and inside stalls.

---

[47] Mark Astley, *Mercy for Animals Undercover Animal Cruelty Video 'Contrived' DFA*, Dairy Reporter (June 30, 2015), https://www.dairyreporter.com/Article/2015/07/01/Mercy-for-Animals-undercover-animal-cruelty-video-contrived-DFA.

[48] *New Expose Provides Shocking Look Inside Massive Dairy Factory*, Animal Outlook (May 9, 2017), https://animaloutlook.org/press/press-releases/new-expose-provides-shocking-look-inside-massive-dairy-factory-farm/.

85.     That footage also revealed hazardous working conditions, including workers forced to handle hazardous formaldehyde with limited personal protective equipment.

86.     Upon information and belief, these types of abuses are common occurrences at dairy farms from which Chobani sources the ingredients to make the Products.

## IV.     Chobani's Representations Are Material and Misleading to Consumers.

87.     Defendant's false and misleading representations that Chobani's Fair Trade USA Certified Products adhere to the "highest standards," "promot[e] sustainable livelihoods," and "support[] safe . . . animal care" are materially misleading to consumers.

88.     A majority of consumers would stop buying from brands that they believe are unethical; 35% would stop buying from brands they perceive as unethical even if there is no substitute available.[49] Additionally, 63% of consumers feel that ethical issues are becoming more important.[50]

89.     A survey of 5,000 consumers showed that significant segments of the national consumer base prioritize "more transparency from food producers and retailers," "accountability and transparency through the entire food supply chain," and "fair treatment of workers."[51]

90.     Consumers also care about animal welfare.

91.     Research has shown that consumers place significant value on food carrying assurances of higher animal welfare and are more likely to purchase such products.[52]

92.     Because Chobani's practices fall short of the comprehensive worker protection and safe animal care that it advertises, Chobani's marketing of the Products as adhering to the "highest

---

[49] *56% of Americans Stop Buying From Brands They Believe Are Unethical*, Mintel (Nov. 18, 2015), https://bit.ly/3xZVSaw.

[50] *Id.*

[51] *Consumer Survey Shows Changing Definition of Food Safety*, Food Safety News, https://www.foodsafetynews.com/2016/02/123246/ (last visited Oct. 23, 2023).

[52] C. Victor Spain et al., *Are They Buying It? United States Consumers' Changing Attitudes Toward More Humanely Raised Meat, Eggs, and Dairy*, 8.8 Animals 128 (July 2018), doi:10.3390/ani8080128.

standards," "promoting sustainable livelihoods," and "supporting safe . . . animal care" is misleading to consumers.

**V.    Chobani Has Knowledge of Its Labor and Animal Practices and Is Aware That Its Representations Are False.**

93.    Chobani knows that it markets the Products as adhering to the "highest standards," "promoting sustainable livelihoods," and "supporting safe . . . animal care."

94.    Chobani also knows the reality of its own labor practices, wages and animal care as well as those of its suppliers' farms.

95.    Consumers frequently rely on food companies, their reputations, and the information provided in their advertising in making purchasing decisions.

96.    Reasonable consumers lack the information and scientific knowledge necessary to ascertain the true source, quality, and nature of the ingredients in the Products.

97.    Reasonable consumers must, and do, rely on Chobani to honestly report how the Products are produced and its supply chain practices.

98.    Reasonable consumers have been, and continue to be, misled and deceived by Chobani to believe that they are purchasing products that support fair labor practices and animal welfare.

99.    Chobani made its false, misleading, and deceptive representations, and omitted the information that would counter those representations, knowing that consumers would rely upon the representations in purchasing the Products.

100.    In making the false, misleading, and deceptive representations regarding workers' wages, empowerment and animal care at issue, Chobani intended for consumers to purchase the Products when consumers might otherwise purchase competing products.

101. In making its false, misleading, and deceptive representations, Chobani knew and intended that consumers would pay more for, and buy more of, dairy products that were marketed as "Fair Trade Certified™" by Fair Trade USA, which Chobani represents as providing meaningful benefits to workers and animals. Thus, Chobani furthered its private interest of increasing sales of its Products, and the price paid, and decreasing the sales of products that are truthfully marketed by its competitors.

102. Chobani has profited enormously from consumers in New York as a result of its falsely marketed Products and its carefully orchestrated image.

103. Chobani deceived and/or was likely to deceive the public by representing the Products as supporting dairy workers and animals.

104. Consumers cannot discover the true nature of the Products by reading Chobani's marketing representations. The on-label representations do not provide any disclaimer or qualifying language for the representations at issue.

105. Discovery of the true nature of the Products requires knowledge that is not available to the average reasonable consumer.

106. The supply chain and production process Chobani uses for the Products is known to Chobani but has not been disclosed to Plaintiff Herceg or other consumers.

107. Chobani has failed to provide adequate relief to purchasers as of the filing of this Complaint.

108. Chobani's representations have conveyed a series of express and implied claims and/or omissions that it knows are material to the reasonable consumer in making purchasing decisions, and that Chobani intended for consumers to rely upon when choosing to purchase the Products.

109. Had Chobani not made the false, misleading, and deceptive representations, Plaintiff Herceg and the Class members would not have been willing to pay the same amount for the Products they purchased and/or would not have been willing to purchase the Products at all, or to purchase as many of the Products.

## JURISDICTION AND VENUE

110. This Court has personal jurisdiction over the parties in this case.

111. Defendant Chobani LLC is a Delaware limited liability company headquartered in Norwich, New York.

112. Defendant regularly conducts and transacts business in New York, purposefully avails itself of the laws of New York, markets the Products to consumers in New York, and sells the Products throughout New York.

113. Plaintiff Herceg is a citizen of New York and consents to this Court's jurisdiction.

114. This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class comprises at least 100 members, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff Herceg alleges that the total claims of individual members of the proposed Class (as defined herein) exceed $5,000,000 in the aggregate, exclusive of interest and costs.

115. Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature and quality of the Products, occurred within this District.

**PARTIES**

116.     Plaintiff Agnes Herceg is an individual consumer who is currently a citizen of Westchester County, New York.

117.     During the Class Period, Plaintiff Herceg purchased the 32 oz Chobani Non-Fat Plain Greek Yogurt product weekly from a Stop and Shop grocery located at 610 White Plains Road, Tarrytown, New York, 10591.

118.     Plaintiff Herceg, when she purchased the Products, saw and believed the on-Product representations that buying the Fair Trade USA Certified yogurt meant saying "yes" to "products made under the highest standards," "sustainable livelihoods," and that the yogurt "supports safe. . . animal care." These representations were material to Plaintiff Herceg and encouraged her to make her purchases. Plaintiff Herceg relied upon these representations, which as a consumer she had no reason to doubt.

119.     Plaintiff Herceg would not have purchased the Products, or would not have purchased them on the same terms, if she had known that, contrary to Chobani's representations, Chobani's Fair Trade USA Certified Products did not provide any meaningful benefits to farm workers or animals, and that Chobani's supply chain does not support sustainable livelihoods for its workers or animals. Having encountered and believed Chobani's representations, Plaintiff Herceg neither expected nor anticipated that the Products she purchased would not deliver on all of these promises.

120.     Upon information and belief, Defendant maintains its headquarters in New York and is responsible for the marketing of the Products in New York.

121. At all times mentioned herein, Defendant was and is engaged in commercial transactions in New York.[53]

## CLASS ALLEGATIONS

122. Plaintiff Herceg brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all other similarly situated individuals nationwide (the "Class"), defined as follows:

> All consumers who purchased the Products within the United States during the statute of limitations period (the "Class Period") and until the date of class certification.

123. Included in the Class, to the extent necessary, is a subclass of all persons who purchased Chobani Products (as defined herein) in New York during the Class Period (the "New York Subclass").

124. Included in the Class, to the extent necessary, is a subclass of all persons who purchased Chobani Products (as defined herein) in New York during the Class Period (the "New York Subclass").

125. Excluded from the Class are (1) Defendant, any entity or division in which Defendant has a controlling interest, and Defendant's legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

126. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    (a)    Whether Defendant is responsible for the advertising at issue;

    (b)    Whether the advertising of the Products was unfair, false, deceptive, fraudulent and/or unlawful;

---

[53] *Where to Buy: New York*, Chobani, https://www.chobani.com/where-to-buy/ (last visited Oct. 23, 2023).

(c)    Whether Chobani breached a warranty created through the marketing of its Products; and

(d)    Whether Chobani's conduct as set forth above injured Plaintiff Herceg and Class members.

127.    Plaintiff Herceg's claims are typical of the claims of the Class in that she was exposed to Defendant's false and misleading marketing and promotional materials and representations, purchased the Products, and suffered a loss as a result of those purchases.

128.    The precise number of the Class members and their identities are unknown to Plaintiff Herceg at this time but may be determined through discovery.

129.    Plaintiff Herceg is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions involving false advertising, and she intends to prosecute this action vigorously.

130.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy and avoids the potential for inconsistent or contradictory judgments. The substantive claims of Plaintiff Herceg and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

131.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it

impracticable or impossible for proposed Class members to prosecute their claims individually, and the disposition of this case as part of a single class action lawsuit will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Herceg's and the Class members' claims together is manageable. Unless the Class is certified, Defendant will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

132.     No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

133.     The prerequisites to maintaining a class action for equitable relief are met: by representing that the Products sold by Chobani ensure safe working conditions and animal care despite Chobani's Fair Trade USA certification ensuring none of these things, Chobani has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

134.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Chobani. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class members are not parties to such actions.

135.     Chobani's conduct is generally applicable to the Class as a whole, and Plaintiff Herceg seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

136.     Plaintiff Herceg knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

# CAUSES OF ACTION

## COUNT I

### Violations of the New York General Business Law § 349
### (On Behalf of Plaintiff Herceg and the New York Subclass)

137.     Plaintiff Herceg realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

138.     The acts of Defendant, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

139.     Chobani has marketed the Fair Trade USA Certified Products with representations that they adhere to the "highest standards," "promot[e] sustainable livelihoods," and "support[] safe . . . animal care" when, in fact, the touted certification does not require, nor does Chobani actually have practices in place to improve key factors for sustainable livelihoods for farm workers in the Products' supply chain or animal welfare beyond the bare minimum already required under U.S. law, and Chobani's supply chain is actually replete with worker and animal abuses.

140.     Chobani has violated, and continues to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of Chobani's violation of § 349, Plaintiff Herceg and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

141.     Chobani's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Herceg and the New York Subclass members to purchase and to pay the requested price for the Products when they otherwise would not have, or would not have purchased as much.

142.     Chobani made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

143.     Plaintiff Herceg and the New York Subclass members have been injured by their purchase of the Products, which were worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

144.     Chobani's advertising induced Plaintiff Herceg and the New York Subclass members to buy the Products, to buy more of them, and/or to pay the price requested.

145.     As a direct and proximate result of Chobani's violation of § 349, Plaintiff Herceg and other members of the New York Subclass paid for falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

146.     By reason of the foregoing, Plaintiff Herceg and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

## COUNT II
### Violations of the New York General Business Law § 350
### (On Behalf of Plaintiff and the New York Subclass)

147.     Plaintiff Herceg realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

148.     The acts of Defendant, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

149.     New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

150.     NYGBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

151.     Plaintiff Herceg and the members of the New York Subclass are consumers who

purchased Chobani's Products in New York.

152.    As a seller of goods to the consuming public, Chobani is engaged in the conduct of business, trade, or commerce within the intended ambit of § 350.

153.    Chobani's representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Chobani's advertising has failed to reveal material facts with respect to its Products, as described above, have constituted false advertising in violation of § 350.

154.    Chobani's false advertising was knowing and intentional.

155.    Chobani's actions led to direct, foreseeable, and proximate injury to Plaintiff Herceg and the members of the New York Subclass.

156.    As a consequence of Chobani's deceptive marketing scheme, Plaintiff Herceg and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, would not have paid the requested price for the Products, and/or would have purchased less of the Products; moreover, as a result of Chobani's conduct, Plaintiff Herceg and the other members of the New York Subclass received products of less value than what they paid for.

157.    By reason of the foregoing, Plaintiff Herceg and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e(3).

## COUNT III
### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff Herceg and All Class Members)

158.    Plaintiff Herceg realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

159.    Defendant's unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein, violate each of the following state consumer protection statutes to the extent that Defendant's Products have been marketed in, and purchased by Class members in the respective state: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); §13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

160.    On May 6, 2022, a pre-suit letter was sent to Chobani via certified mail that provided notice of Chobani's violations of state consumer protection statutes[54] and demanded that within thirty (30) days from those dates, Chobani correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. The letter also stated that if Chobani refused to do so, a complaint seeking damages would be filed. Defendant received the letter on May 9, 2022 but has failed to take corrective action. Accordingly, Plaintiff Herceg, on behalf of herself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices.

161.    Defendant violated these statutes by falsely and deceptively marketing the Products as adhering to the "highest standards," "promoting sustainable livelihoods," and "supporting safe . . . animal care."

162.    Defendant's deceptive marketing was material to Plaintiff Herceg's and Class members' decisions to purchase the Products, to purchase as much of them as they did, and to pay the requested price.

163.    Defendant acted willfully, wantonly, and with reckless disregard for the truth.

164.    Plaintiff Herceg and the Class members have been injured in that they purchased the Products, paid the requested price, and received less than what they bargained and/or paid for.

165.    Plaintiff and Class members are entitled to recover compensatory damages, restitution, punitive and special damages, treble damages, attorneys' fees and costs, and other appropriate injunctive and declaratory relief.

---

[54] This letter further provided notice regarding Defendant's breach of express warranty under the common law of the states where the Products are sold.

## COUNT IV

### Breach of Express Warranty

### (on Behalf of Plaintiff Herceg and All Class Members)

166.    Plaintiff Herceg realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

167.    Defendant provided Plaintiff and other members of the Class with written, express warranties that the Products were Fair Trade USA Certified and that they, therefore, adhered to the "highest standards," "promot[ed] sustainable livelihoods," and "support[ed] safe . . . animal care."

168.    These affirmations of fact or promises by Chobani relate to the goods and became part of the basis of the bargain.

169.    Plaintiff Herceg and members of the Class purchased Chobani's Products, believing them to conform to the express warranties.

170.    Chobani breached these warranties, resulting in damages to Plaintiff Herceg and other members of the Class, who bought Chobani's Products but did not receive the goods as warranted.

171.    As a proximate result of the breach of warranties by Chobani, Plaintiff Herceg and the other members of the Class did not receive goods as warranted. Moreover, had Plaintiff Herceg and the Class members known the true facts, they would not have purchased Chobani's Products, or would have purchased Chobani's Products on different terms, or would have purchased fewer of Chobani's Products.

172.    Notice of these breaches of warranty was provided to Defendant as described in *supra* ¶ 160, which is incorporated here by reference as if fully set forth herein.

173.    Plaintiff Herceg and the members of the Class, therefore, have been injured and have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Herceg respectfully requests that the Court enter judgment in her favor and in favor of the Class as follows:

A.   An order certifying the proposed Class and Subclass; appointing Plaintiff Herceg as representative of the Class and Subclass; and appointing Plaintiff Herceg's undersigned counsel as class counsel for the Class and Subclass;

B.   An order declaring that Defendant is financially responsible for notifying Class members of the pendency of this suit;

C.   An order declaring that Defendant's conduct violates the statutes referenced herein;

D.   An order awarding monetary damages, including actual damages, statutory damages, and punitive damages, in the maximum amount provided by law under the statutes named herein;

E.   An order awarding compensation for breach of warranty;

F.   An order awarding Plaintiff Herceg and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

G.   Any further relief that the Court may deem appropriate.

## JURY TRIAL DEMANDED

174.   Plaintiff Herceg hereby demands a trial by jury.

DATED: October 23, 2023

**RICHMAN LAW & POLICY**

_____
Kim E. Richman
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (914) 693-2018
krichman@richmanlawpolicy.com

**ESBROOK P.C.**
Christopher J. Esbrook
Lauren B. Wright

321 N. Clark, Suite 1930
Chicago, IL 60654
T: (312) 319-7680
christopher.esbrook@esbrook.com
lauren.wright@esbrook.com

Erika Giwa-Amu
135 E. 57th Street, Suite 15-111
New York, NY 10022
T: (312) 319-7685
erika.giwa-amu@esbrook.com